D.O.C.'s pornography policy. In 2012, it approved it again. In 2016, however, it found the policy facially unconstitutional. In terms of the sexually explicit material, an inmate was allowed to possess, the only differences between the old and new policies were the new policy prohibits pornographic prose, in addition to pornographic pictures. In addition to genitalia and female breasts, the new policy adds pubic area and buttocks to the definition of nudity. And the new policy reverted to a dictionary definition of the word features, as in a prominent part or characteristic. You mean significant differences, right? Because if you look at the addendum 48, 49, 50, you know, the chart of them side by side, there are more changes than that. There are more changes, but... You're saying those are the significant ones. Well, these are the ones that affect what an inmate is allowed to possess. And so the new policy used the word feature in its everyday word as a prominent part or in the brief that the policy was basically the same as the 2000 policy. Are you changing your position now that it's not basically the same? Well, it's... The objective is the same, Your Honor, and that is to make sure that there is an orderly institution. There are some changes that were made that were used to close loopholes in the policy. For example, the change that extended the policy to pornographic prose was enacted because pornographic prose causes the same problems within the institution as actual pictorial pornography causes. But didn't the district court find that there was very little evidence in the record supporting the changes or expressing any rationale or reasons for the changes that were made? Well, the district court itself in 2003 supported the policy saying, quote, Inmate possession of pornography had been an ever-increasing problem. For example, inmates sold, rented, or traded pornographic magazines in violation of other DOC policies. Disputes about the use or return of such magazines resulted in threats against inmates. Certain groups of inmates who were prohibited from possessing pornographic materials, such as sex offenders, could access material from those who were not prohibited from possessing it. End quote. And the district court also noted that there were concerns with the use of pornography to sexually harass staff and to feed unhealthy addictions within the prison walls. And then in 2016, Secretary Kamenk stated in his affidavit that those concerns continued and necessitated the changes in the policy. Is paragraph 15 of his affidavit all you have? Well, that and the district court's finding in the previous case. Correct. Thank you. That these are legitimate problems within the institution. Yes, Your Honor. Isn't the significant difference come in the definition of sexually explicit material? And that significant difference being it expanded it to written material? Well, as Secretary Kamenk points out, there is the same problems. That's the main thrust of, at count two, I think it might be, of the complaint, isn't it? The definition of sexually explicit and expanding it to written materials as opposed to pictorial? I'm not sure what their thrust is exactly, Your Honor, but the change from sexually explicit pictures to also to include prose was meant to meet the same problems that were being caused by pictures themselves. So, when we look at... What evidence was there that prose would cause the same problems? Well, that was what Secretary Kamenk was saying, was that the reason for the changes to the policy were necessitated by the same institutional concerns that were observed by the district court in 2003. He doesn't use the word prose or writings, though, right, in paragraph 15? It's just the changes... I don't think at a glance. The changes that were made, the revisions to the policy... But it doesn't say writings or prose or anything about writings or prose? But that was among the changes made. Certainly. Yeah, I get that, but I mean, the words aren't there, right? Not in so many words, but it's encompassed in the thought that... Not real words, you know, normal words. Go ahead. That he expressed, that the changes were necessitated by the same concerns that animated the policy in 2003. So, how much do you think you have to show? Well, the burden is actually on Mr. Sisny to prove that the policy doesn't meet rational objectives. So, we believe that we've made the showing. We believe also that the established, as in Morrow, that there's institutional disruption that flows from the circulation of pornography within the institution. And according to Amatel, quote, there is a significant body of research showing that long-term exposure to pornography can make its male audience more aggressive, more tolerant of violence against women, more susceptible to myths about rape. And that, quote, common sense tells us that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are degrading and disrespectful. I have a few sentences behind you. Don't you have to show the legitimate government interest, and it's not so remote as to render the policy arbitrary or rational? Don't you have to show that? Well, that has been shown so many times, Your Honor, that I don't think it's necessary to plow that ground over and over and over again in all these First Amendment cases. We have Morrow... Yeah, but that's between the regulation and that. Yes, and our regulation, as written in 2003, was upheld. And so really what we're talking about are the changes, and the legitimate objectives behind the policy were affirmed in 2003. So the question really is, do the changes change that any? And the change tells us that graphic textual descriptions of pornography can have the same negative effects in an institution as pictures can. It can become currency within the institution just the same as a picture can. So that was the experience that the South Dakota Department of Corrections had, and that's why they made the changes that they did. The other changes include such examples as what a feature... Is there any evidence beyond this reference to common sense that written materials have the same effect? Well, that's from Secretary Kamenk. His statement that the same problems that were found to be... Did he provide any instances where a piece of sexually explicit literature created that kind of problem? No, there are none in his affidavit, Your Honor, but that is what he is saying, is that in the experience of the DOC that these sexually explicit prose items were also causing problems. So that was a loophole that needed to be closed in the old policy. But I don't see anything in the affidavits explaining why the changes were made. Are you just simply relying on the rationale for the original policy entirely? Well, Secretary Kamenk says that the reasons for making the changes in 2016 in his affidavit were the same reasons that they enacted the policy in the first place. And the policy itself included certain loopholes that needed to be closed. For example, the prose loophole. They were having problems with prose, so they were having problems with prose. And the definition... It doesn't say that in the record, though, does it? In a general sense, that's what Secretary Kamenk is saying, is that the changes were caused by institutional problems that were identified in the 2003 decision. And among those changes were the change to prose, and the change to the definition of nudity, and the change to features. So, for example, with features, the definition was itself fairly racially inadequate. So, for example, the magazine Popular Photography does not routinely contain explicit imagery or promote itself based on its sexually explicit content. But in addition of Popular Photography that contained a retrospective of sexually explicit or violent Robert Mapplethorpe photographs, therefore would not meet the definition of features under the old policy. So that necessitated a change to the definition of features. So now we have simply a dictionary definition. If a Popular Photography magazine contains that kind of photography in it, it would be a rather prominent part of that magazine and probably the reason why that magazine has been requested by an inmate. Was the so-called all-or-nothing policy in which a magazine that doesn't otherwise have pornographic material might have a certain racy picture or something like that, so the entire magazine is banned, was that policy part of the earlier policy or is that part of the change? It's how it's implemented. It's how it's always been implemented. And the all-or-nothing policy has been affirmed again. It's one of those sort of well-established things in the law at this point that it's not a de minimis intrusion on the prisons to go through everything, pull out this page or that page. And also there was concern, I think cited by the United States Supreme Court itself, that taking things out of magazines might disrupt things more than depriving them of the entire magazine. So the all-or-nothing policy has been implemented both on the old and new versions and upheld in the law. And we've also, we also have the Hugh Banks case, Your Honor, wherein the district court in 2012 did affirm the exclusion of pornographic prose. In that case, the confiscation of the sexually explicit prose in two books in and as applied challenge in the Hugh Banks case. And yet four years later, then the district court reverses itself and finds the prohibition on pornographic prose facially unconstitutional. And obviously if Jane Austen had believed that explicit sexuality was integral to her story, she could have written those types of scenes into Pride and Prejudice. Indeed, one might even argue that it was her inability to write such scenes at the time that is central to her critique of England's prevailing sexual mores. And likewise, if explicit sexuality was in some way integral to fantasy literature about warriors and dragons, one wonders how J.R.R. Tolkien managed to write a saga as lengthy as The Lord of the Rings without so much as one character kissing another. So as the titles to Mr. Sisney's books reflect, Thrones of Desire, Pride and Prejudice, The Wild and Wanton Edition, those books exist as vehicles for accessing graphic depictions as in descriptive of wanton sexuality and the fulfillment of sexual desires. The plots of Sisney's books exist strictly as vehicles to introduce explicit descriptions of sex on pretexts that are very thin. The books, it would seem, would meet certainly the definition of obscenity from Miller versus California in the sense that their works, when taken as a whole, appeal to the prurient interest without any serious literary, artistic, political, or scientific value. Does the record have any specific examples of problems caused by the so-called gaps in the 2000 policy that were being fixed? It's simply the general statement by Secretary Kamenk that the reason these changes were made was due to the fact that the same problems that animated the 2003 policy animated the changes. And under the current policy, Sisney is not prevented from viewing the female form. As in Morrow, the DOC's policy does not ban sexually explicit photographs of clothed females. Sistine Chapel notwithstanding, the education exception allows artistic depiction of nudity. And Sisney himself offers no proof that a less restrictive definition of nudity would achieve the DOC's goals of eliminating the bartering of sexually explicit material, sexual harassment of staff, or interference with rehabilitative programs. Indeed, one need look no further than the Pretty Face comic book itself for proof that Sisney's pornography fetish is interfering with his rehabilitation. The book clearly contains very explicit photographs of half-nude schoolgirls, not even women, but young schoolgirls. The Pretty Face is bannable under the O policy, right? That's what both courts found, yes, Your Honor. But Sisney persists in bringing an as-applied challenge to that particular material. It contains, in addition to several instances of some rather explicit half-nude young ladies, one male forcibly engaging in oral sex on a schoolgirl through her undergarment in a ludicrous pretext of proving that she is really he. That kind of material is not conducive to someone whose crime involves, as here, the objectification of a woman for killing her because she wouldn't have sex with him. But even if such material was not detrimental to Sisney's personal rehabilitation, preventing such material from circulating among sex offenders within the walls has been affirmed as a legitimate exercise of power by the prison authorities. The so-called banning of what you refer to as manufacturing, did that come in in the 2014 policy? Yes, it did, Your Honor. It wasn't in the 2000 policy? No, it wasn't. But it's a form of possession, even though whether it's manufactured or shipped in it's a form of possession. So technically, as outgoing correspondents, isn't there a higher standard that applies in order for the department to ban manufacturing? That too is a form of possession. When it's outgoing, whether they're manufacturing it in their prison, if you can't possess it in the first place, you can't mail it out. So that gets back to the changes that were made to affect the type of material that the inmates were allowed to possess. But again, is there anything in the record about manufacturing that was done in the past? It's again, Secretary Kamenk's affidavit stating generally that these changes were made to address problems. And if I may reserve the balance of my time. Thank you, Your Honor. Judge Gunder, Judge Benton, Judge Tumheim, good morning. My name is Stephen R. Morrison and I represent Charles Sisney. This is a summary judgment case. And there are essentially two facts that are undisputed, that were established in district court, that compel a finding in favor of Sisney on all four Turner factors. First, the current pornography policy restricts all sexually explicit material, as well as core religious, social, political First Amendment material on its face and without reference in the policy to any legitimate penological interests. Mr. Morrison, can we talk a little bit about what the district court did? It appeared to me that the district court struck the entire anti-porn policy. And then went back to the 2014 policy to assess the as-applied items. Is that about right? I think you're correct. You're absolutely correct that the court struck the current policy as facially unconstitutional. In reading the complaint, it looked to me like the complaint really attacked the definition of sexually explicit as being overbroad and the outgoing male policy. Did the district court go a little too far in throwing out the entire policy? I don't believe so. I believe Sisney's complaint, it was clearly a facial challenge to the entirety of the policy. And this court has to look at the entirety. In his prayer for relief, he says, as it pertains to the definition of sexually explicit. That's the core of the policy. The definition of sexually explicit. I won't argue with that. But does that require throwing out the entire policy? Yes, I believe it does. The definition of sexually explicit can be narrow and it can include alternatives. Pictorial was in the definition of sexually explicit and that's been approved in the past. Absolutely, Your Honor. I don't think you're here challenging that, are you? No, we're not. Okay, so back to my question. Did the district court go a little too far in throwing out the entire policy? I don't think the district court had the power to reinstate the King policy. I think the district court . . . That's part of my question, right? Because the district court went on to do the as applied under the old policy that doesn't exist. The district court's analysis in that context is a little confusing and I think . . . I'm with Your Honor that we're trying to figure out what was going on. I think what was going on was the district court struck the current policy and had to evaluate pretty face based on something. So it evaluated it based on the next best alternative, which would be the King policy. I'm fairly certain that's what the district court was doing. Why wouldn't it have been better to say this part of the definition of sexually explicit is too broad, the rest of it's fine, instead of throwing out the entire thing? There are other problems with the policy that Cisney did challenge. He challenged the ban on manufacturing, on written materials, and had the state been amenable to Cisney's discovery requests, we would have had an established record on that, but the state for whatever reason chose not to go down that route and file its own motion for summary judgment based on the facts that it had. And the facts that it had, the facts that were established in district court, is that this is a global ban on an entire category of First Amendment protected conduct. And based on that, and based on the fact that there is absolutely no evidence that the current policy is helpful in any way, or that the King policy was unhelpful or ineffective in any way at pursuing what we concede are legitimate penological interests, all four of the Turner factors cut in favor of Cisney. If I may, I'd like to turn to those. Can I ask you one question first? Because I thought, reading the district court opinion, that the court ordered that the policy, the new policy, could not be enforced except when it was consistent with the old policy. In other words, the King approved policy sort of went back into effect. Sort of. Am I wrong about that? I don't, I do think you're wrong, because again, I don't think the district court has the power to reinstate the King policy. The district court was just doing its best to analyze pretty face in the absence of the current policy, which had been deemed unconstitutional. And indeed, our suggested easy alternative, which is the fourth Turner factor, is the King policy. It's proven workable over years. The state has adduced no evidence that the new policy is in any way helpful, or that King was in any way ineffective. Now, if I may, I'd like to turn to the first Turner factor, kind of focus on that, in part because I think Turner factor two, three, and four cuts dispositively in Cisney's favor, and the state, in its blue brief, declined to litigate based on those factors. Before you go there, though, can you tell me what, I understand that the expansion to significant changes that you're attacking? Absolutely. The expansion into written, the expansion into manufacture, and sending out under Martinez, that is incredibly problematic. The lack of definition of feature. Let me, going back to the outgoing, if I read your client's complaint to attack the definition of sexually explicit, and then in a separate count, outgoing material, would he have standing to challenge outgoing? In other words, is there any pleading whatsoever that he attempted to send something out, and it was censored? No, there wasn't. I do believe... So he had a standing problem, wouldn't he, on that regard? I don't think he would have a standing problem, because this is a facial challenge, so he can assert First Amendment violations that were suffered by other inmates, and other from CISNY. So I think he didn't send anything out that's at issue today, but I still think he has standing. In part because it's a facial challenge, but also in part because had he chosen to send something out, and he was prohibited from communicating with somebody on the outside, not only would that outside person be a victim, but so would he. That's the fundamental problem I have. It seemed to me that it was a facial challenge, not to the entire porn policy, but to the significant changes, the written, maybe the manufacturer, the outgoing. And that's where I sort of fundamentally don't understand what the district court did in terms of throwing out the entire policy. I think we would be comfortable with that interpretation of CISNY's argument, because our policy, or our recommendation simply is, remove all of the innovations. What you have left is the King policy. It's been upheld, it's constitutional, it's proven workable, and so forth. Now the state noted the Hugh Banks case, and the Hugh Banks case is different. The Hugh Banks case dealt with a bulk rate ban on materials that encourage sexual behavior, or may be detrimental to an offender's rehabilitation. That policy was focused on legitimate penological interests. This one isn't. It's not reasonably related to any interest in a way that operates in a neutral manner. This is a content-based policy. It defies common sense to think that images of the Sistine Chapel, Smithsonian Magazine, Wired Magazine, National Geographic, Guns, Germs, and Steel, images of pre-World War II Parisian art, would in any way further legitimate penological interests. It's an exaggerated and over-broad policy, because it serves to eradicate an entire category of First Amendment speech, and King is the costless alternative, which suggests that the current policy is not reasonably related. There are any number of reasons, under Turner, why this policy is facially unconstitutional. You tell from Turner, and this is what the other side I think was trying to tell me, they think you have the burden on everything here. What do you have the burden on, what do they have the burden on, or do you know? The state has the burden, I believe, on the first Turner factor. Citizeny has the burden on the remaining three factors. That's my impression of the law. This Court has definitely said on the alternatives you have the burden. Absolutely. I get that, but I wonder, but you see on the middle ones, you agree that you have the burden on those. Facially neutral alternative means accommodation. So there are four Turner factors. The first one is the reasonable relation. Now, we think the state has the burden of proving that. Of course, I think we have the burden of disproving it, and we're comfortable taking that on, because it lacks common sense, it's content-based, it's exaggerated and over-inclusive, and there's a costless alternative. As to the other three Turner factors, the second one, do alternative means of exercising the right to access sexually explicit material remain open? The answer is no, on the face of the policy. Third, what would the impact of accommodation have on prisoners, staff and resources? Citizeny asked the prison, asked the defendants for instances of sexual harassment under the new policy. They gave none. So the impact of accommodation as established in the facts in district court would be zero. And then the fourth Turner factor. Can I ask you a question about the second Turner factor? What is the right in this case? Is it the right to see sexually explicit materials, or is it something else? The right is to access sexually explicit materials. And we know this from two cases that came before this court, Murphy v. Missouri Department of Corrections, where this court held that a total ban on publications that espouse white supremacy is overly broad and does not closely conform to the purpose of upholding the security of the prison. Replace white supremacy with sexually explicit content. And then Murchison v. Rogers, regarding a violent Newsweek article about Mexican drug cartels. This court held that it did not suggest that prison officials may categorically prohibit all materials which may contain some content involving violence. Replace the word violence with sexually explicit content. Now let's keep in mind that the only instance of pornography in this case is the title of the policy. One could argue that Thrones of Desire perhaps is pornographic. Fair enough. But the vast majority of material prohibited under this policy as pornography is not pornographic. I know pornography when I see it. You're leaving pretty face out, huh? I would vehemently disagree that pretty face is pornographic. You disagree with the district court then, of course? Of course we're asking that this court affirm the facial challenge of the district court's holding regarding that, and that this court reverse the district court's holding regarding pretty face. We simply don't believe that pretty face features nudity. There are some images of breasts, some of them real, some of them not. But the story is not publicized based on its sexually explicit content. It's close. It's publicized based on its gender bending content. And I'm sure this court will review pretty face as I have. It's kind of an unusual story. It's a weird story. It's Japanese anime intended for adolescents. But the overriding theme of the story is not sex. There are certainly sexually sexual parts of the story, I suppose. But we simply don't think that pretty face features sexually explicit content. Isn't there a strong argument, though, that the content of pretty face depicts sexual assault? And isn't that racist to a higher level in terms of what the department can do? I certainly take the state's point that that image in pretty face could very much look like sexual assault. And of course, this court is going to review that for itself. The point of that part of pretty face was for somebody to discern whether the victim, let's call this person a victim, was indeed a boy or a girl. That's not ludicrous. It's part of the story. And if the policy prohibited images of sexual violence, I dare say we would not have much of a case. But the policy doesn't prohibit that. It prohibits everything. And it prohibits images that are found in National Geographic, guns, germs, and steel. The state wants to focus on thrones of desire and pride and prejudice, the wild and wanton edition in pretty face, for understandable reasons. But this policy bans so much more than that. That's why this policy is content-based. It's aimed only at sexually explicit material. And it's not aimed at all on pursuing legitimate penological interests. As far as content-based restrictions go, again, you can look at the Hugh Banks case, which the state cited. You can take a look at the Federal Bureau of Prisons policy as an analogy. The Federal Bureau of Prisons prohibits material that could undermine prison security, rehabilitation, and so forth. The BOP goes on to say, we cannot ban materials solely on the basis of their sexual content. Now, if there's a material that is primarily sexual but that could also undermine legitimate penological interests, ban it. That's not what this policy is about. Can I ask you one question quickly? The manufacturing issue and the Martinez test, the state says that this is possession before it is sent out in outward correspondence, and therefore it simply falls under the normal Turner standard, I guess. What's your view on that? Then why ban outgoing mail? Simply ban manufacture. There's a problem with that as well. Manufacture includes a letter to a loved one. And in the state's own discovery, that includes a letter that says, wife, I really miss your exposed thighs. It includes an inmate's personal diary. All of this stuff. It also includes, and I realize my time is up, it also includes attempted possession. So if I simply attempt to write something down, I would be in violation. For these reasons, your honors, I would ask this court to affirm the district court's holding regarding Cisney's facial challenge and the district court's holding, and reverse it regarding pretty face. And also, thank you for granting Amicus's motion to argue. Ashford and Itell will present for five minutes. Thank you. Very good. Thank you, Mr. Morrison. The court will hear from the Amicus. Thank you, and may it please the court. My name is Ashford and Itell, on behalf of Amicus National Coalition Against Censorship, in support of Plaintiff Appellee Charles Cisney. Your honors, nearly every prison speech ban that has been rejected by courts has been much narrower than this one. And no court in this country has upheld a prison speech ban as broad as this one. That's what I'd like to focus on today, is just how overbroad this prison speech ban really is. Specifically, I want to focus on three ways that it's overbroad. First, the policy defines sexually explicit to ban not just visual depictions, such as photos of people having sex, but it also bans mere written descriptions of the type that might read in a love scene in classical literature. The second way this policy is overbroad is that it doesn't just ban materials that feature sexual acts or nudity as their primary content, like an issue of Penthouse or Hustler, but it also bans materials that merely include some incidental nudity, like an issue of National Geographic that might have an article on an Amazonian tribe that's not fully clothed. And the third way that this policy is overbroad is that its definition of nudity is over-inclusive and has no exception for traditional artwork, which has led to bans on Michelangelo and Picasso and Matisse. Taken together, this really is one of the most overbroad prison speech bans that's been challenged in courts today. Now, I do want to address another point that came up, and that is, who has the burden? Turner v. Safley and Thornburg v. Abbott make clear that, yes, the prisoner does have the general burden of disproving the policy, but once the prisoner points to an alternative regulation that satisfies the constitutional right and imposes no more than a de minimis impact on penological interest, now the burden shifts to the state to show that the policy does indeed have more than de minimis impact on penological interest. And here- Do you say Turner says that? Turner does say that, yes. Okay. Do you know where Turner says that? I was looking a moment ago and didn't see it. Well, it's in Factor 4, I believe, the exact text. I can't remember, but it's, if the prisoner can point to an alternative regulation, then the state has to show that it imposes more than a de minimis impact. And here- You don't think that's limited to the fourth factor? You think that analysis applies to all four of the factors? Well, actually, Turner really emphasizes on the fourth factor. Turner v. Safley, the court struck down a ban on marriages between inmates, and the court emphasized Factor 4, this alternative regulation. And it says that if there isn't a regulation that imposes more than a de minimis, that imposes no more than a de minimis impact, and the state can't disprove that, then it's an exaggerated response. That's really the central holding, we think, of Turner, Your Honor. In Dean v. Bowersox, this court actually upheld a prison speech ban solely because the inmates did not provide an alternative regulation. It is an unpublished opinion, though. It is, Your Honor. Yeah, and it is the clearest on that point. Yes, Your Honor. And also, I think, though, Dean does reaffirm Turner's holding, that exaggerated responses by prisons are unreasonable. And when determining whether a response is exaggerated, courts should look to evidence provided by the prison, of which here the state has provided none. But courts can also look to similar prison policies, and I urge this court to look at the other policies described in the cases, in the briefs from both parties. And what you'll see is that this policy, the South Dakota policy... That's kind of where you begin. What's the closest one? The only one that even comes close to this is Aiello, which was described in the other amicus brief in this case, and that was actually rejected. What court is that, tell me? That was a district court. I don't know what state it was out of. But every other policy in all of the briefs is much narrower than this. And to that, I also want to update the court on a new case that came down after we filed our brief. It's called Banks v. Jessen out of a district court in Minnesota. And there, the court considered a ban on nude images for sex offenders. What's important to note about that policy is that it did not ban written materials. And that goes to just how overbroad the South Dakota policy is. For if written materials were deemed appropriate for sex offenders to read, then should be appropriate for the general prison population to read. Thank you, Your Honors. Thank you, Mr. Nitell. One of the parties may want to consider submitting a 28-J letter on the new case. Sure. I have the citation, if you want, but before that, okay. We'll take it in a 28-J. Thank you. Thank you. Mr. Sweedland, rebuttal. Thank you, Your Honors. We hear from Mr. Sisney and from the amicus brief that there is a flaw in the amicus. What I think is a flawed premise in their argument, one rejected by the court in Amatow that, quote, there is some minimum entitlement to smut in prison. I think that right is always subject to institutional concerns. Mr. Sisney is not sitting in his living room any longer. His rights are subject to restriction. And as in Morrow, institutional considerations may well justify banning all depictions of nudity or if even Victoria's Secrets catalogs start sparking riots. What about traditional literature that has sexual situations in it? I think, again, we have to look at the nature of the content and we have to look at what is the objective of the scene. So, for example, the district court cited a book in which there was one scene involving an adolescent, I guess, learning to masturbate that was central to the story itself. That's one scene and it was written by the author. Here we're talking about Pride and Prejudice, the Wild and Wanton edition that was not written by the author. So I think there's some distinctions there in the type of prose and how integral it is really to the story. Certainly, one looks at the scene in Thrones of Desire, one struggles to see how integral that is to the story. There's another passage in the opinion below that's somewhat disturbing because it found the policy facially unconstitutional because, quote, while society's standards regarding nudity and sexually explicit conduct have become more liberal or more coarsened according to one's point of view, over the past 16 years, the DOC policy has grown more Victorian and strict over the period rather than being influenced by the mores of society in which the DOC exists. There's no part of the applicable First Amendment analysis that looks to or requires Department of Corrections policies to keep pace with society's liberalized sexuality. And while Eighth Amendment analysis sometimes looks to evolving standards of decency, there's no part of the applicable First Amendment analysis requires a comparison to society's evolving standards of indecency or devolving standards of decency, however one might say. But the characterization of the DOC's policy as Victorian is troubling because it reflects an application of an improper standard to judging the DOC policy. And it suggests an that of liberality and greater liberality. What policy is in effect right now? It's a good question. I guess at a minimum the King policy. So, but that's... So the 2000 policy is approved in King? Yes, Your Honor. So... Do you think the court had the power to reinstate that policy? It might be a prudential act, I think, under the circumstances given the need for a policy. It's CISNY's burden to show, once the state has shown a rational connection, it's CISNY's burden to show that the state is wrong. And the state submits it has shown that via the precedent and via Secretary Kamenk's affidavit. Thank you, Your Honors. Thank you, Mr. Sweedman. The court appreciates your arguments and briefs today. An interesting case. We'll consider it submitted and decide it as soon as possible.